**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**



FILED by _RAL_ D.C.
INTAKE

DEC 2 9 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

|  |  |
|---|---|
| AVMED, INC., a Florida Not-for-Profit Corporation d/b/a AvMed Health Plans, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SHERIDAN HEALTHCORP, INC., a Florida Corporation, individually and in its representative capacity on behalf of its affiliates and subsidiaries, | ) ) ) ) ) ) |
| Defendant. | ) ) ) ) |

Civil Action No **09 - 23851**

**CIV - HUCK**   MAGISTRATE JUDGE O'SULLIVAN

Jury Trial Demanded

## COMPLAINT

Plaintiff AvMed, Inc. d/b/a AvMed Health Plans ("AvMed"), by and through its undersigned counsel, brings this civil action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26,  to obtain damages and injunctive relief against Defendant Sheridan Healthcorp, Inc. ("Sheridan"), and in support alleges:

### I. PARTIES

1.    AvMed is a Florida not-for-profit corporation organized under Chapter 617 of the Florida Statutes with its principal place of business in Miami, Florida.  AvMed is licensed as a health maintenance organization pursuant to Chapter 641 of the Florida Statutes, providing health care coverage and related benefits to its members.   Additionally, AvMed offers a

Medicare Advantage plan through an agreement with the Centers for Medicare and Medicaid Services ("CMS") pursuant to which AvMed administers certain benefits on behalf of CMS, including the Part A and B Medicare benefits of AvMed's members who are Medicare Advantage plan enrollees ("AvMed's Medicare enrollee members"). In this capacity, AvMed receives payments from CMS to pay for services provided to AvMed's Medicare enrollee members and administers the benefits and claims for those members. AvMed, through its Medicare Advantage plan, stands in the shoes of CMS when paying for the services provided to AvMed Medicare enrollee members.

2.    Sheridan is a for-profit Florida corporation that bills itself as "the nation's leading anesthesia provider." Sheridan sells anesthesiology and other health care services in Miami-Dade, Broward, and Palm Beach Counties and other areas in South Florida through its employees and/or certain other affiliated persons or entities. Sheridan maintains its principal place of business in Broward County, Florida.

3.    AvMed purchases anesthesiology and other services from Sheridan and/or its affiliates on behalf of AvMed's enrollees and sells various health insurance benefits packages to employers and consumers throughout the state of Florida.

## II. JURISDICTION AND VENUE

4.    This Court has personal jurisdiction over the parties to this action because Sheridan maintains its principal place of business within the Southern District of Florida and a substantial part of the events giving rise to the claims alleged in this Complaint occurred within the Southern District of Florida. For the same reasons, venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b) and (c).

5.    This Court also has jurisdiction over the subject matter of plaintiffs' federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, and 28 U.S.C. §§ 1331 and 1337(a).

6.    Sheridan is engaged in interstate commerce, and the conduct giving rise to the claims asserted by AvMed in this action substantially affects interstate commerce. Sheridan sells anesthesiology services in at least nineteen states, provides services to patients from outside Florida, receives a substantial portion of its revenues for services provided outside of Florida, receives payments for medical services rendered to patients from the United States Government and from plans and other third-party payors located outside Florida, and purchases equipment and medical supplies from vendors located outside Florida. Additionally, on information and belief, Sheridan has financed some or all of its expansion efforts in Florida through non-Florida investors, lenders, and banks.

## III. OVERVIEW OF ALLEGATIONS

7.    Sheridan is the dominant provider of hospital-based anesthesiology services in South Florida. Sheridan has exclusive arrangements with numerous hospitals in Miami-Dade, Broward, and Palm Beach Counties (the "Tri-County area"), including hospitals that AvMed and other health plans must include in the provider networks that they offer to employers and consumers. AvMed and other health plans cannot market viable plans in the Tri-County area without including hospitals in which Sheridan is the only anesthesiology provider. Sheridan has engaged in anticompetitive and exclusionary conduct designed to willfully acquire, maintain, and abuse its market dominance, prevent competition, and eliminate consumer choice. The ultimate effect of this conduct is to force health plans and other third-party payors, employers and

- 3 -

consumers to pay prices above the competitive level for certain anesthesiology services as described more fully below.

8. Sheridan, with the intent of acquiring, maintaining, or exercising market or monopoly power in the relevant markets described herein, has established relationships with hospitals that AvMed and other health plans and managed care organizations cannot contract around. Sheridan has also successfully implemented an anticompetitive strategy of (i) acquiring, merging with, or otherwise controlling formerly independent anesthesiology providers; (ii) obtaining, renewing and/or maintaining exclusive arrangements for anesthesiology services at hospitals essential to AvMed and other health plans; (iii) using covenants not to compete and other anticompetitive contract provisions to prevent hospitals from being able to terminate Sheridan's exclusive contracts and to prevent their former anesthesiologists from being able to compete with Sheridan; and (iv) engaging in other anticompetitive contracting strategies that exploit Sheridan's control over hospitals necessary to viable provider networks, all to the detriment of AvMed, AvMed's commercial and Medicare Advantage members, and other health plans and consumers of health care services.

9. Sheridan's conduct has resulted in prices for hospital-based anesthesiology services that are significantly above competitive levels and thereby has contributed to the rising cost of health care, particularly for those residents of South Florida who require anesthesiology in connection with inpatient health care services at acute care hospitals. Higher prices are exactly what Sheridan sought when it undertook its anticompetitive strategy. Sheridan's executives have boasted about Sheridan's intent to create "leverage" and "market clout" by ensuring that it "can't be contracted around" by health plans. Sheridan's CEO has stated publicly that Sheridan's business model allows it to deliver "enhanced bargaining power" and "enormous" cash bonuses

to its employed anesthesiologists while still having a substantial amount of "free cash flow" for further acquisitions. For commercial plans, Sheridan's inflated profits come at the expense of third-party payors, such as AvMed, and employers and consumers who must pay the supracompetitive prices for anesthesiology services resulting from Sheridan's anticompetitive conduct. For Medicare Advantage plans, Sheridan's inflated profits also come at the expense of taxpayers and the Federal Government, who ultimately provide the funding for these plans. Under CMS rules, cost savings achieved by Medicare Advantage plans are shared with the government and translate into greater benefits for members. Sheridan's anticompetitive conduct reduces cost savings that AvMed is able to achieve and thereby reduces both cost savings to the Federal Government and benefits to Medicare Advantage plan members.

10.   AvMed is one of the direct victims of Sheridan's actions. Sheridan has the ability to extract from AvMed higher prices for hospital-based anesthesiology services than AvMed would have to pay in the absence of Sheridan's unlawful acts, and Sheridan claims the ability to extract even higher rates through its "acceptance by conduct" strategy, which is described more fully below. AvMed's analysis to date indicates that the anesthesiology rates Sheridan has sought to impose on AvMed for the provision of anesthesia services to AvMed's commercial members are at least 30 percent higher than the highest comparable national and regional benchmark rate and, in many cases, are approximately 100 percent higher than comparable benchmarks.

11.   Sheridan also claims the ability to extract from AvMed higher prices for hospital-based anesthesiology services provided to AvMed's Medicare Advantage members than AvMed would have to pay in the absence of Sheridan's unlawful acts. As an out-of-network provider (i.e., non-contracted provider) who accepts Medicare reimbursement, Sheridan is obligated to

- 5 -

accept from AvMed Medicare allowable rates established by the Federal Government for Sheridan's provision of anesthesia services to AvMed's Medicare Advantage members. Through Sheridan's unlawful acts, however, Sheridan is seeking to circumvent Medicare law and impose charges on AvMed for the provision of anesthesia services to AvMed's Medicare enrollees which currently grossly exceed (by approximately 600%) the Medicare allowable fees established by the Federal Government.

12.   As a result of Sheridan's anticompetitive business practices, AvMed has been and will be further injured in its business or property.

## IV.  NATURE OF COMMERCE AMONG HEALTH PLANS, HEALTH CARE PROVIDERS, AND CONSUMERS

13.   In many markets, sellers negotiate prices with the end-consumers who purchase their goods and services.  The sale of anesthesiology services performed at hospitals is more complex.  First, for the most part, patients do not directly choose anesthesiologists, who provide services in connection with other inpatient procedures patients receive.  Typically the surgeon or facility in which the service is being provided will decide which anesthesiologist will furnish anesthesiology services, with little or no input from the patient or the patient's insurer.  Second, hospital-based health care providers, such as anesthesiologists, rarely negotiate directly with the patients they treat over the actual price of health care services, and patients almost never pay directly for such services.  Instead, various types of "third-party payors," including AvMed, negotiate the prices in advance on a periodic basis, and pay the bulk of the health care providers' negotiated rates.  Depending on the provider and service in question, the rates negotiated by third-party payors are usually much less than providers' inflated list prices or "billed charges" for those services.  In many cases, providers have reacted to this downward pressure on prices by artificially increasing their billed charges above previous levels.  As markets have adjusted to

achieve equilibrium, this process has resulted in a cycle of increasing billed charges to levels that far exceed the rates that a provider actually expects to receive or accepts for the provider's services. As a consequence, almost no one pays a provider's unilaterally-set billed charges.

14.   Health plans, such as AvMed, are one type of third-party payor. Health plans sell pre-paid health coverage to individuals directly, or through benefit plans sponsored by their employers. The individuals who are covered by AvMed's health plans are referred to as enrollees or members.

15.   The United States has a largely employer-based health care financing system in which a significant majority of consumers who have private health insurance obtain it through their employers. Typically, consumers select insurance coverage from one or more health plans with which their employers have contracted.

16.   Health plans contract with health care providers, or with firms like Sheridan that employ or contract on behalf of certain providers, and obtain their commitment to furnish health care services to plan members, usually at negotiated prices, in an effort to ensure that members have access to quality health care services at reasonable prices. Providers who enter such agreements are referred to as "participating providers." A health plan's participating providers together constitute the plan's "provider network."

17.   In return for being part of a health plan's provider network, providers typically agree that the rate established by their contract constitutes payment in full (except for certain out-of-pocket costs and co-payments), such that the provider may not "balance bill" – i.e., charge the health plan's member the difference between the allowed amount and the provider's billed charges or otherwise directly bill the plan's member for the services provided.

18. The primary purposes of such agreements are to ensure that qualified professionals are available to treat the health plan's enrollees should the need arise and that such services are furnished at competitive prices. They are also designed to minimize the out-of-pocket and/or premium costs incurred by the health plan's individual members and their employers who sometimes subsidize or pay in full for employees' coverage. Such agreements also provide predictability for the health plan so it can budget and establish pricing for the plans offered to members and employers.

19. Over 90 percent of AvMed's members (i.e., AvMed's commercial members) obtain coverage through their employers. Typically, the employer selects which health plans to offer its employees. Because employees sometimes consider the quality of health care benefits when they decide where and under what terms to accept employment, many employers try to make available health care plans that are attractive to their employees. Thus, employer demand for health plan services is partially derived from employee preferences. As a general matter, employees prefer health plans that offer a broad choice of hospitals, physicians, and other providers that are geographically convenient for them and their families. At the same time, employees (and employers) want to ensure that the amount of money that they spend on employee health benefits reflects competitive rates.

20. Consequently, health plans compete to be among those offered by employers based on price, quality, the geographic convenience of the hospitals, physicians and other providers in their networks, and other factors relevant to employees and employers. Similarly, because some employers offer their employees several plans from which to choose, a health plan needs to offer an attractive network to convince employees to enroll in its plan as opposed to a plan from one of

its competitors. A health plan cannot offer a competitive or even viable product without an adequate provider network in the geographic area covered by the plan.

21. When the market functions properly, health plans are able to obtain competitive prices from providers by engaging in what is called "selective contracting," whereby the health plan can decide which providers will be included or excluded from its provider network. Selective contracting depends on the ability to refuse to accept the terms offered by a provider because those terms are unreasonable. Selective contracting, or at least the threat of selective contracting, typically allows a health plan to obtain competitive pricing from providers, as well as commitments to cooperate in a health plan's efforts to increase efficiency and quality.

22. A health plan's ability to engage in selective contracting, and thereby to reduce costs to members, is dependent upon the existence of competitive alternatives. If there are no competitive alternatives to a provider or a provider group in the marketplace, then that provider or provider group will have the ability to raise prices above competitive levels.

23. Health plan members benefit from choice of, and competition among, providers in the form of lower prices, improved access to services, and the ability to select a provider that best meets a particular member's needs. Employers benefit from choice and competition among providers in the form of lower prices, improved access to services, increased willingness to cooperate in health management and cost containment efforts, and the ability to develop packages of health services and benefits that best balance cost, quality, and accessibility.

24. AvMed, like many other health plans in South Florida, also offers and administers a Medicare Advantage plan on behalf of the Federal Government. The Federal Government established the Medicare Advantage program as an alternative to the traditional fee-for-service Medicare program to provide, among other things, Medicare beneficiaries with choice and a

broader range of covered services, and to better contain costs through appropriate utilization of services by Medicare beneficiaries. More than ten million of the eligible Medicare beneficiaries (i.e., the elderly and disabled) in the United States are currently enrolled in Medicare Advantage health plans throughout the United States. Approximately 10% of AvMed's total membership are Medicare Advantage enrollees. Even though private health plans such as AvMed operate Medicare Advantage plans, the enrollees are still considered Medicare beneficiaries.

25. Medicare Advantage plans do not have the flexibility, as commercial plans do, in setting premium rates for their members and negotiating the rates that they pay to providers. The member revenue of Medicare Advantage plans is strictly established by Federal regulation. The Federal Government establishes a Medicare Advantage plan's reimbursement based on the amounts that the Federal Government would pay if the health plan's Medicare Advantage members were traditional Medicare fee-for-service beneficiaries (i.e., where the Federal Government directly administers the benefits of Medicare beneficiaries) and based on the assumption that Medicare Advantage plans (such as AvMed) will pay providers (such as Sheridan) in accordance with Medicare allowable rates set by the Federal Government (i.e., the amounts that the Federal Government would directly pay to providers for services provided to Medicare fee-for-service beneficiaries).

26. Absent an executed written contract (containing certain terms required by Medicare law) between a Medicare Advantage plan and a provider, Medicare law requires Medicare Advantage plans (such as AvMed) to pay the rates set by the Federal Government for traditional Medicare fee-for-service beneficiaries (i.e., Medicare allowable amounts). The same law also requires out-of-network/non-contracted providers (such as Sheridan) to accept the Medicare rates. Although Medicare Advantage plans and providers are permitted to negotiate and

"validly" contract for a different rate, a Medicare Advantage plan is limited by its fixed funding from the Federal Government, which is based on the assumption that the Medicare Advantage plan will reimburse providers at rates which are similar to Medicare allowable rates. Accordingly, Medicare Advantage plans cannot afford to pay providers at rates considerably higher than Medicare allowable rates and maintain a viable product.

## V. RELEVANT PRODUCT MARKETS

27.    The relevant product markets for purposes of this action consist of a primary market for the sale of inpatient anesthesiology services at acute care hospitals and an aftermarket for the sale of inpatient anesthesiology services at acute care hospitals at which Sheridan is the exclusive anesthesiology provider.

28.    There are no clinical or economic substitutes for inpatient anesthesiology services at acute care hospitals.  If the prices for inpatient anesthesiology services at acute care hospitals increase a small but significant non-transitory amount, patients cannot turn to other medical services in that hospital to replace anesthesiology services or otherwise go without such anesthesiology services.  Likewise, if the prices of anesthesiology services in all acute care hospitals in a relevant geographic market were to increase a small but significant amount, the services provided by physicians that practice in specialties other than anesthesiology would not be  practical  alternatives  to  the  anesthesiology  services  and  expertise  provided  by anesthesiologists.

29.    An acute care hospital is a short-term hospital that has facilities, medical staff, and all necessary personnel to provide diagnosis, care, and treatment of a wide range of acute conditions.  Acute care hospitals are distinct from freestanding outpatient settings such as ambulatory surgery centers and from long term care, psychiatric, rehabilitation, or other non-

acute care hospitals, all of which lack the range of facilities and personnel of an acute care hospital. The provision of anesthesiology services in a freestanding outpatient setting, at non-acute care hospitals, or in other settings, is not a substitute for the provision of such services to inpatients in acute care hospitals. While there are some services that can be provided at both a freestanding outpatient setting and an acute care hospital, there are certain services – such as major surgical procedures – that are only available in the acute inpatient hospital setting. Moreover, because of the services they require or their particular medical condition, for some patients it is generally only medically appropriate to receive care in the acute hospital inpatient setting (examples of this may include patients requiring open heart surgery, patients with severely compromised vascular conditions, or patients with multiple diseases or conditions that increase the risks associated with receiving general anesthesia). Determining what type of facility to use for a particular procedure is ultimately a medical decision for the treating physicians and patient to make, not AvMed. When such patients require anesthesiology services in connection with the inpatient hospital services they receive, their only alternative is to obtain such services from anesthesiology providers who furnish services to inpatients in acute care hospitals. If the price of anesthesiology services rendered in the acute care inpatient hospital setting increases a small but significant non-transitory amount, those acute care inpatient services cannot be shifted to freestanding outpatient facilities or to non-acute care hospitals or to other settings.

30.   A health plan needs to contract with a critical mass of acute care hospitals in order to offer a viable provider network and also to comply with regulations. See 42 CFR § 422.112. As the health care industry and health care benefit structures have evolved in recent years, employers and health plan members have increasingly demanded larger provider networks, and

viable health plans generally must include a broad range of hospitals in order to compete with other health plans and in order to provide adequate medical treatment to members.

31. In order to obtain the critical mass of acute care hospitals necessary to create a viable network, health plans must also provide their members with in-network access to certain "must have" acute care hospitals or hospital systems. For example, on information and belief, provider networks in South Florida that do not include the Memorial Healthcare System or Hospital Corporation of America ("HCA") hospital systems in their networks would not be competitive or viable. Even lack of access to one particular major acute care hospital, such as Baptist Hospital of Miami, could prevent a health network from being competitive with other networks. Although a health plan does not necessarily need to include every major acute care hospital in its provider network in order to be viable, a health plan must include a critical mass of such hospitals in order to compete with other insurers' provider networks and in order to provide adequate medical treatment to members.

32. In order to create a viable network, a health plan must also contract with a sufficient number of surgeons to satisfy its members' needs because some members will require surgery at some point, and all members want to know that skilled surgeons are available should the need arise. When a member requires surgery, the member's primary care physician may refer the member to a surgeon, or in some cases, the member may search for the best surgeons in a particular area. A health plan must not only contract with a sufficient number of surgeons to meet its members' needs, it must also provide its members with access to acute care hospitals at which those in-network surgeons have privileges. If the hospitals at which the in-network surgeons have privileges are not included in a health plan's network, the members or their employers may seek another health plan that provides such access.

- 13 -

33.   Providing members with access to hospitals where surgeons have privileges also requires the health plan to pay for anesthesiology services provided in connection with inpatient procedures at those hospitals. Inpatient anesthesiology services provided at acute care hospitals are an essential input for a viable health plan provider network because, without these services, a health plan would be unable to provide for adequate medical treatment for its members and would be unable to compete with other health plans for both employers and individual members. Moreover, under Florida law, when members receive medical treatment at in-network hospitals, health plans must cover and pay for the anesthesiology services associated with such treatment, regardless of whether the health plan has contracted with the anesthesiology services provider. Fla. Admin. Code Ann. R. 69O-191.049.

34.   Thus, for a health plan, there is no substitute for including in its network a sufficiently large provider network consisting of a critical mass of acute care hospitals, a critical mass of surgeons who have privileges at those hospitals, and hospital-based providers such as radiologists, anesthesiologists, and pathologists who also have privileges at those hospitals. Although a price increase at a single hospital, or from hospital-based providers at a single hospital, may lead a health plan to forego contracting with that hospital, if the critical mass of acute care hospitals needed to form a viable network engages in a small but significant non-transitory price increase, the health plan may not be able to contract around that group of hospitals and still maintain a viable network. Health plans have no choice but to deal with those acute care hospitals – and the providers at those hospitals – that allow them to reach the critical mass necessary to form a viable network.

35.   Accordingly, the sale of inpatient anesthesiology services at acute care hospitals is the relevant product market in which to evaluate Sheridan's anticompetitive conduct.  In the primary market for such services – i.e., the market in which a health plan such as AvMed initially establishes its provider network – Sheridan competes with other providers of inpatient anesthesiology services at acute care hospitals in the relevant geographic area.  Once that network is established, however, there is an aftermarket for the provision of anesthesiology services in which, for reasons discussed more fully below, Sheridan's prices are not constrained by competition in the primary market.

36.   Once a health plan such as AvMed establishes a network including the Sheridan exclusive hospitals, Sheridan has the ability to raise prices and exclude competition with respect to the provision of anesthesiology services at those hospitals.  A health plan such as AvMed cannot avoid Sheridan's power to raise prices and exclude competition by switching to other anesthesiologists at an acute care hospital where Sheridan is the exclusive anesthesiology provider.  Nor can AvMed generally direct the member to another acute care hospital where Sheridan does not have an exclusive arrangement for one or more of the following reasons:  (1) the member's enrollee contract with AvMed may state that the member can receive covered services at the original hospital; (2) the hospital may have contracted with AvMed to prohibit AvMed from steering patients away from its facilities; (3) the member's surgeon may not have privileges at a non-Sheridan hospital; (4) the member may be unwilling to switch to another surgeon or hospital; (5) medical reasons may make such a switch impractical; and/or (6) Florida law prohibits AvMed from steering members away from hospitals in its network.  Fla. Stat. Ann. § 641.315(9).  In addition, AvMed cannot avoid paying Sheridan because Florida law requires that health plans pay for anesthesiology services associated with treatment at in-network

hospitals, regardless of whether the health plan has contracted with the anesthesiology services provider. Fla. Admin. Code Ann. R. 69O-191.049. Even when AvMed's contracts with Sheridan-exclusive hospitals are up for renewal, AvMed cannot contract around Sheridan by eliminating the hospital from its network because plan members will not tolerate the exclusion of certain hospitals on which they or their physicians and surgeons are dependent. Any effort by AvMed to contract around Sheridan would cause employers and plan members to drop AvMed as their health plan and would overall compromise the viability of AvMed's network. In that sense, once AvMed decided to include the Sheridan-exclusive hospitals in its network (which AvMed was, and is, required to do in order to offer a viable product in South Florida), it was locked into Sheridan because of the exclusive nature of Sheridan's relationships with those hospitals if Sheridan were already present, or became locked into Sheridan when Sheridan acquired the exclusive relationship with those hospitals.

37. Prior to making the initial decision to include hospitals in its network that were or ultimately became Sheridan-exclusive hospitals, AvMed had no way of predicting that Sheridan planned to acquire many independent anesthesiology practices, enter into exclusive contracts with hospitals, and prevent its anesthesiologists from competing with Sheridan through covenants not to compete, giving it the power to unilaterally charge supracompetitive prices and seek to force those prices on AvMed and other plans in South Florida. If, prior to including any such Sheridan-exclusive hospital in its network, AvMed had known that Sheridan would engage in such conduct, it may have been able to take steps to avoid or mitigate the effects of that conduct. Because AvMed was not able to predict that Sheridan would engage in such conduct, it was not able to use whatever competitive constraints existed in the primary market to avoid the effects of Sheridan's anticompetitive conduct.

- 16 -

38.   Because AvMed needs the Sheridan exclusive hospitals in order to have a viable network, and because there are information barriers that prevent competition in the primary market from constraining Sheridan's actions in the aftermarket, the provision of anesthesiology at hospitals at which Sheridan is the exclusive anesthesiology provider is a relevant aftermarket for antitrust purposes.   This is also demonstrated by Sheridan's ability to raise prices at such hospitals without losing any business and by the fact that health plans continue to use such Sheridan hospitals after being sued by Sheridan in its effort to force supracompetitive prices upon them.

## VI. RELEVANT GEOGRAPHIC MARKETS

39.   Several relevant geographic markets exist in which to evaluate Sheridan's conduct in this case.   First, the Tri-County area constitutes a relevant geographic market.   There are also geographic submarkets that are no larger than the individual counties within the Tri-County area and areas within 30 minutes driving time of any particular geographic location in the Tri-County area along Interstate 95.

40.   Anesthesiology services are derivative of other acute care services provided at hospitals.   Therefore, the geographic markets and submarkets for inpatient anesthesiology services at acute care hospitals are the same as the geographic markets and submarkets for acute care hospital services generally.

41.   When competing with other health plans for employers and members in South Florida, health plans such as AvMed must provide hospital coverage across most or all of the entire Tri-County area where the employer's employees may reside.   Health plans such as AvMed cannot turn to hospitals outside the Tri-County area as substitutes for hospitals within the Tri-County area.   Patient flow data indicate that over 99 percent of patients residing in the Tri-

- 17 -

County area who receive hospital services in Florida receive such services from Tri-County area hospitals, and only an extremely small percentage of Florida patients residing outside of the Tri-County area come into the area for hospital services. Accordingly, the relevant geographic market is no larger than the Tri-County area.

42.   Because patients tend to consume health care locally, health plans competing for members must provide adequate hospital coverage within areas of localized competition where these individual members reside. In the Tri-County area, patient flow data indicate that nearly 95 percent of patients who obtain acute care hospital services in Florida obtain such services within a 30-minute drive from where they live. The majority of people and hospitals in the Tri-County area are located in relatively close proximity to Interstate 95. Thus, geographic submarkets consist of the acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95.

43.   Such areas of localized competition are also no larger than the individual counties of Miami-Dade County, Broward County, and Palm Beach County. Although county lines are somewhat arbitrary, the three counties of the Tri-County area correspond roughly to 30 minute drive times from points in the center of the counties. Patient flow data indicate that over 90 percent of patients in the Tri-County area that seek hospital services in Florida visit hospitals that are located in the same county in which the patients reside. Thus, geographic submarkets also exist consisting of Miami-Dade County, Broward County, and Palm Beach County.

## VII. SHERIDAN'S DOMINATION OF THE RELEVANT MARKETS

44.   There are several relevant markets and submarkets for inpatient anesthesiology services in this case: (a) the market for inpatient anesthesiology services at acute care hospitals in the Tri-County area; (b) the submarkets for inpatient anesthesiology services at acute care hospitals in each of Broward, Palm Beach and Miami-Dade Counties; (c) the submarkets for

- 18 -

inpatient anesthesiology services at acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95; and (d) the aftermarket for inpatient anesthesiology services at acute care hospitals where Sheridan is the exclusive anesthesiology provider within the Tri-County area.

45. Sheridan's share of the primary market for the provision of inpatient anesthesiology services at acute care hospitals in the Tri-County area is 52 percent of privately-insured patient admissions in surgical Diagnosis-Related Groups ("DRGs") as defined in the CMS FY2007 DRG classification. For purposes of this complaint, surgical DRGs serve as a reasonable proxy to measure inpatient anesthesiology services because anesthesiology is most commonly used in conjunction with surgical procedures.

46. Using the same measures, Sheridan's market shares in the submarkets in the individual counties are 58 percent (Broward County), 38 percent (Miami-Dade County), and 65 percent (Palm Beach County). Sheridan's market shares of the submarkets for inpatient anesthesiology services at acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95 range from 43 percent to 70 percent, as more fully set forth in the chart attached as Appendix A.

47. Sheridan's market shares in certain important clinical areas are even higher than those set forth above. For example, hospital discharge data indicates that Sheridan has exclusive control over anesthesiology services at hospitals in the Tri-County area which represent more than 60 percent of the privately insured labor and delivery inpatient admissions. In the three individual counties within that area, Sheridan's share of privately-insured labor and delivery inpatient admissions ranges from approximately 46 percent to approximately 80 percent.

48.   Once AvMed became locked into Sheridan as described herein, it lost the ability to contract around Sheridan, and AvMed does not have the ability to steer its members away from Sheridan. Accordingly, Sheridan's share of the aftermarket for inpatient anesthesiology services at acute care hospitals where Sheridan is the exclusive provider is or approaches 100 percent.

49.   Entry barriers in the relevant markets are high, and significant, timely, and effective entry into the provision of inpatient anesthesiology services in the Tri-County area is unlikely for several reasons. Any anesthesiology practice desiring to compete with Sheridan would require substantial scale, and the initial start-up costs for an anesthesiology practice in the Tri-County area are substantial. Establishing a new practice in the Tri-County area would be especially difficult because Sheridan has erected substantial entry barriers by entering into exclusive arrangements with numerous hospitals in the area, as well as contractual arrangements that seek to motivate hospitals to accept Sheridan's anticompetitive conduct toward health plans. Even if a hospital was able to terminate its exclusive agreement with Sheridan, it would have to find or assemble an entire group of replacement anesthesiologists with whom the hospital's surgeons are familiar and comfortable to replace the Sheridan anesthesiologists, which would be difficult because Sheridan's exclusive arrangements with hospitals, employment of substantial numbers of anesthesiologists in the relevant market, and use of covenants not to compete with those employed anesthesiologists substantially limit the pool of available physicians to replace Sheridan.

50.   Sheridan's market shares support an inference that Sheridan has the ability profitably to raise prices for inpatient anesthesiology services above the competitive level, control prices, and exclude competition. Additionally, Sheridan's inflated prices described herein further support this inference.

51.  AvMed does not have access to information which would enable it to measure market shares on a revenue basis, but it is anticipated that after discovery AvMed will be able to demonstrate that Sheridan's share of anesthesiology revenues in the relevant primary market and submarkets is higher than the shares set forth above because Sheridan's prices generally exceed those of other anesthesiology providers in the Tri-County area.

52.  In addition, Sheridan's power to raise prices and exclude competition is demonstrated by its conduct, including its "acceptance by conduct" contracting approach by which Sheridan claims the ability to extract supracompetitive rates far in excess of any comparable benchmark rate, as described below.

53.  In 2005, AvMed and Sheridan began negotiating a new contract.  Sheridan refused to agree to a reasonable rate and no contract was signed.  At that point, Sheridan took the position that it was making an "offer" to AvMed that Sheridan would provide anesthesiology services to AvMed's commercial and Medicare Advantage members on an out-of-network basis at Sheridan's full billed charges.  These out-of-network rates are far higher than comparable benchmark rates charged by anesthesiology providers for commercial claims in competitive markets, and are grossly in excess of the Medicare allowable rates established by the Federal Government for the Medicare Advantage claims.  Sheridan asserted that AvMed would be deemed to have "accepted" this offer if its members (which includes commercial or Medicare Advantage members) received anesthesiology services at a Sheridan-served hospital.

54.  Sheridan's "acceptance by conduct" approach has placed AvMed in the untenable position of either (1) permitting patients who have planned procedures requiring anesthesia at Sheridan hospitals (which are also AvMed Network hospitals) to proceed with the treatment and thereby face a lawsuit by Sheridan to collect its supracompetitive rates or (2) terminating all

Sheridan exclusive hospitals from AvMed's Network (as this is the only method available to AvMed to prevent its members from using Sheridan hospitals for non-emergent services), which would necessarily interrupt patient-physician relationships, improperly limit member and employer options, and effectively put AvMed out of business in South Florida.

55.   Because of AvMed's inability to cause its members (which include commercial and Medicare Advantage members) to use hospitals at which Sheridan does not practice, AvMed members have received anesthesiology services from Sheridan and, according to Sheridan, AvMed must pay the full billed charges, which represent supracompetitive rates due to Sheridan's monopoly power and anticompetitive conduct.

56.   By refusing to extend its contract with AvMed for the provision of anesthesia services to AvMed's commercial members at a reasonable rate and by raising its rates above any reasonable level, Sheridan effectively terminated a voluntary prior course of dealing with AvMed and has constructively denied AvMed access at reasonable rates to the hospitals at which Sheridan has entered into exclusive arrangements.

57.   Furthermore, Sheridan's attempt to impose its supracompetitive full billed charges on AvMed for the provision of anesthesia services to AvMed's Medicare Advantage members (in the absence of an executed written agreement containing essential terms required by Medicare law) has threatened and continues to threaten the viability of AvMed's Medicare Advantage plan whose funding is fixed by the Federal Government as previously alleged.   If allowed to succeed, this unlawful scheme by Sheridan would have dire consequences for the Medicare Advantage plans and the Medicare Advantage system as a whole in South Florida. Moreover, if such an "acceptance by conduct" scheme was employed by other providers

throughout the United States, the Medicare Advantage system would cease to exist because no Medicare Advantage plan could remain financially viable.

58. Sheridan's unreasonable restraint of competition and exercise of monopoly power is not restricted to its dealings with AvMed. On information and belief, Sheridan has similarly refused offers from Humana, WellCare, Aetna, Coventry/Vista, United HealthCare, Blue Cross Blue Shield of Florida, and other health plans (collectively the "Plans'") to make Sheridan a participating provider at competitive rates. It has also refused the Plans' offers to pay Sheridan a competitive rate for its services. Instead, Sheridan has adopted business tactics intended to force the Plans to either remove vital hospitals from their networks in order to prevent their subscribers or enrollees from using those hospitals, which is not a realistic option, or to pay Sheridan supracompetitive rates far in excess of what any valid benchmark regards as reasonable for Sheridan's services.

## VIII. SHERIDAN'S ANTICOMPETITIVE CONDUCT

59. Sheridan has achieved its ability to profitably raise prices above the competitive level, control prices, and exclude competition by engaging in predatory conduct that does not reflect superior efficiency, skill, or business acumen. Sheridan has successfully implemented an anticompetitive scheme to entrench itself in the majority of hospitals in the relevant geographic markets, and in particular those hospitals that are necessary for a viable provider network, ensuring that health plans will be unable to contract around Sheridan and that Sheridan will be able to charge supracompetitive prices for its services. In addition, Sheridan has abused its monopoly position by setting its billed charges at unreasonable and anticompetitive rates and unilaterally implementing its "acceptance by conduct" approach to contracting with health plans so that health plans have had no choice but to continue to deal with Sheridan.

- 23 -

60.   Sheridan's scheme consists of several different forms of conduct.  First, Sheridan has increased its market power by acquiring or controlling formerly independent anesthesiology practice groups in the relevant geographic markets.  As part of Sheridan's pitch to acquire groups/providers, Sheridan boasts that it can use its market power to strong arm health plans to obtain higher rates and increase profits and thereby pay the target anesthesiologist more if they join Sheridan.  Second, Sheridan has "locked up" the hospitals at which it practices through exclusive arrangements, non-compete agreements with physicians, and financial and contractual arrangements designed to permit Sheridan to extract high rates for inpatient anesthesiology without resistance from hospitals and to make it more difficult to remove Sheridan as an exclusive anesthesiology provider.  Third, Sheridan has dramatically raised the rates it charges health plans for anesthesiology services, and has sought to impose these rates on health plans through anticompetitive contractual strategies.  Each of these forms of conduct is explained below.

61.   In addition, Sheridan's anticompetitive conduct closely parallels transactions in which Sheridan was acquired by various private equity companies and by Sheridan's own senior management.  In 1999, an investor group led by Vestar Capital Partners and Sheridan senior management took the company private.  In 2004, J.W. Childs Associates and Sheridan senior management acquired the company from Vestar.  In 2007, Hellman & Friedman LLC and Sheridan senior management acquired the company from J.W. Childs.  On information and belief, Sheridan's investors included Dr. Mitchell Eisenberg and Dr. Lewis Gold, Sheridan's Chairman and Chief Executive Officer, respectively. J.W. Childs has emphasized that its goal is to acquire and develop companies with "leading market share positions that benefit from barriers to competition and high profit margins."  In addition, Sheridan's senior management team has

publicly stated that its goal is to "leverage" its "market clout" or monopoly power by being "at the right facilities" such that "the payers understand that they just can't [contract] around you." With little public scrutiny, these private equity companies and senior managers have had the means and incentive to increase Sheridan's market power through acquisitions, exclusive contracts, and non-competes, and have used both this increased market power and anticompetitive contracting strategies to demand dramatically higher anesthesiology rates in South Florida.

## A. Acquisitions

62.   On information and belief, Sheridan has acquired numerous formerly independent anesthesiology practices throughout the relevant geographic markets. According to Sheridan's CEO, half of its growth has been by acquisition.

63.   At least one of Sheridan's goals in acquiring formerly independent anesthesiology practices is to increase Sheridan's already substantial leverage over health plans. On information and belief, Sheridan's sales pitch to potential targets includes statements to the effect that Sheridan can reduce hours and increase pay because of the higher rates Sheridan can "strong arm" from health plans. In other words, Sheridan effectively markets its ability to restrict output of services and raise prices to potential acquisition targets.

64.   On information and belief, since at or around the year 2000, Sheridan has directly or indirectly acquired hospital-based anesthesiology practices, in whole or in part, with exclusive relationships with at least 15 hospitals, including the following facilities:   Jupiter Medical Center, Jackson North Medical Center, Mercy Hospital, Boca Raton Community Hospital, Palms West Hospital, Wellington Regional Medical Center, Memorial Regional Hospital South, Good Samaritan Medical Center, Memorial Hospital Miramar, Kendall Regional Medical Center, JFK

Medical Center, Northwest Medical Center, Plantation General Hospital, University Hospital and Medical Center, and Baptist Hospital Miami.  As a result of such acquisitions, AvMed understands that Sheridan acquired or entered into contractual or de facto exclusive arrangements with 7 of these hospitals between 2000 and 2005, and acquired or entered into such arrangements with 8 of these hospitals since 2006.  Although it is possible that Sheridan entered into these exclusive arrangements by some means other than a direct or indirect acquisition of the hospitals' existing anesthesiology providers, in whole or in part, such a transaction is unlikely and would be an exception to the rule given Sheridan's growth strategy and the barriers to an entirely new anesthesiology group beginning to practice at an existing hospital.

65.    Sheridan's acquisition of these and other formerly independent anesthesiology practices has increased Sheridan's market power and substantially lessened competition for the provision of inpatient anesthesiology services in hospitals in the relevant geographic markets. Sheridan's market share of surgical inpatient services for privately-insured patients in the Tri-County area prior to making these 15 acquisitions since 2000 was 16 percent, while Sheridan's market share following the acquisitions is 52 percent.  In addition, much of Sheridan's market power is a result of the 8 more recent acquisitions in and after 2006, with Sheridan's share increasing from 36 percent to 52 percent in the Tri-County area and from 13 percent to 65 percent in Palm Beach County.  Sheridan's acquisition of these and other formerly independent anesthesiology practices has also enabled Sheridan to acquire monopoly power over inpatient anesthesiology services at hospitals in the relevant geographic markets.

66.    This data may understate the true impact on competition from Sheridan's various acquisitions.  AvMed has been unable to obtain complete information regarding the number of

Sheridan's acquisitions and the timing of those acquisitions because Sheridan is a closely-held, private company, and information regarding its acquisitions has been concealed from the public.

67.    Sheridan has continued to acquire and combine with anesthesiology practices with the intent of increasing and expanding its market power within the relevant geographic markets.

### B. Exclusive Arrangements

68.    Once Sheridan acquires or establishes control over an anesthesiology practice, it typically takes over the formerly independent group's contract with the hospital(s) at which the group provided anesthesiology services.  As a result of its acquisitions and other strategies to acquire control over hospital-based anesthesiology, Sheridan and its affiliates employ all of the anesthesiologists at numerous hospital facilities in the relevant geographic markets and have entered into exclusive arrangements with these hospitals such that patients who require or receive anesthesia in the hospitals have no other choice but to use Sheridan's anesthesiology services.

69.    Sheridan's exclusive arrangements with hospitals prevent competition from other anesthesiologists at those hospitals and require patients and health plans to use Sheridan's anesthesiology services any time a patient needs inpatient services at a hospital with which Sheridan has an exclusive arrangement.

70.    The impact of Sheridan's exclusive arrangements on health plans (and health plan members) is much more significant than exclusive arrangements entered into by other, smaller anesthesiology providers because of Sheridan's significant market-wide presence in the relevant geographic markets and presence at "must have" acute care hospitals or hospital systems.  The exclusive arrangements, along with the additional anticompetitive measures described below, permit Sheridan to control the anesthesiology services at a substantial number of hospitals

throughout the Tri-County area and ensure that health plans are unable to contract around Sheridan.

71.   On information and belief, Sheridan requires the anesthesiologists that it employs in the Tri-County area to enter into covenants not to compete that restrict the ability of the anesthesiologists to provide competing inpatient anesthesiology services if they leave the employment of Sheridan.   The effect of such covenants not to compete is that these anesthesiologists are not able to provide any alternative to Sheridan at many hospitals in the Tri-County area where they hold privileges.

72.   There is no legitimate business justification for the non-compete covenants in Sheridan's employment arrangements.   Anesthesiologists generally do not have "customer" relationships with patients and Sheridan does not provide any of its employed or affiliated anesthesiologists with specialized knowledge, know-how, or trade secrets.   On information and belief, the purpose and effect of the non-compete covenants is to ensure that anesthesiologists employed by or affiliated with Sheridan do not leave Sheridan's employ and begin offering competing services at or to hospitals in the relevant geographic markets.   Sheridan's CEO has publicly stated that hospitals are at a "disadvantage" as a result of Sheridan's non-compete agreements with anesthesiologists.   Thus, on information and belief, the purpose and effect of the non-compete arrangements is to deter entry into the provision of anesthesiology services in connection with inpatient acute care hospital services provided in the relevant geographic markets and thus to maintain Sheridan's substantial monopoly power and anti-competitive pricing.

73.   On information and belief, Sheridan demands subsidies from hospitals at which it provides anesthesiology services.   Sheridan removes its subsidy requirements when it reaches

target revenue levels from private payors, which gives the hospitals at which Sheridan has exclusive arrangements an incentive to tolerate Sheridan's unreasonable pricing demands of health plans. By contrast, on information and belief, Sheridan is unable to extract subsidies in fields in which more competition exists in South Florida, such as emergency medicine.

74.   The combination of each of the practices described above, as well as other anticompetitive acts and practices, has led to Sheridan's market dominance and monopoly power in the relevant markets. On information and belief, Sheridan's anticompetitive conduct was undertaken with the intent of dominating the relevant market, thwarting competition on the merits, and extracting supracompetitive reimbursement rates from third party payors, such as AvMed.

### C. "All-or-Nothing" and "Acceptance by Conduct" Contracting

75.   Sheridan's monopoly power throughout the relevant geographic markets enables it to force health plans to accept Sheridan's contract terms and inflated supracompetitive rates on an "all-or-nothing" basis.

76.   Although Sheridan's market share is substantial across the Tri-County area, in particular geographic regions, Sheridan has exclusives with all or nearly all of the acute care hospitals that contract with health plans. Those geographic regions include, but are not limited to, portions of Palm Beach County and southern Broward County.

77.   Sheridan leverages its monopoly power in those regions to extract monopoly prices in all regions in the Tri-County area by insisting on a single price schedule for anesthesiology services throughout the Tri-County area and Florida, and by refusing to contract at all with health plans unless the contract includes all the hospitals where Sheridan has exclusive arrangements to provide anesthesia services. This "all or nothing" approach constitutes an abuse of Sheridan's

monopoly power. There is no legitimate business justification for this abuse. In addition, the anticompetitive harm from that practice outweighs any pro-competitive justification for its use.

78.  Sheridan also abuses its monopoly power through its "acceptance by conduct" approach to raising its pricing substantially above competitive levels. This practice is particularly reprehensible because it threatens to put the health and well-being of the patient at risk in order to extract monopoly profits. Under Sheridan's theory, if AvMed refuses to accept Sheridan's anticompetitive pricing demands, AvMed's only option would be to interfere with the clinical or personal choices of AvMed's members and their physicians as to which hospitals and surgeons to use for medical procedures – an option that is plainly not open to AvMed for the reasons detailed herein. There is no legitimate business justification for this abuse.

## IX.  ANTITRUST INJURY AND HARM TO COMPETITION

79.  If left unchecked, Sheridan's anticompetitive and exclusionary acts, including its acquisition of anesthesia practices, exclusive contracting, restrictive covenants, predatory contracting strategies with hospitals, predatory contracting strategies with health plans, and other forms of anticompetitive practices will continue to result in higher health care prices and a further reduction in choice and access to inpatient anesthesiology services in the relevant geographic markets. As to Medicare Advantage plans, if left unchecked, Sheridan's unlawful scheme to extract greater than Medicare allowable fees will severely affect the financial viability of such plans in South Florida and the Medicare Advantage program as a whole.

80.  On information and belief, price and quality competition in the provision of inpatient anesthesiology services in the relevant geographic markets has been severely restricted and/or eliminated. Third-party payors, such as AvMed, are unable to obtain competitive prices for these services. Purchasers of hospital services such as AvMed are forced to purchase

inpatient anesthesiology services from Sheridan when they would prefer to purchase such services from someone else and/or on different terms. Accordingly, the prices charged to AvMed and other consumers are artificially inflated and well above the level that AvMed would pay for such services in a competitive market.

81.   AvMed's analysis to date indicates that Sheridan's anesthesia rates charged to AvMed are at least 30 percent higher than the highest comparable national and regional benchmark rates and, in many cases are approximately 100 percent higher than comparable benchmarks.

82.   On information and belief, because of Sheridan's actions and monopoly power over inpatient anesthesiology services, prices for anesthesiology services in the Tri-County area are some of the highest in the nation, and substantially higher than they would be in competitive markets. Nonetheless, even when they are compared to other rates in the Tri-County area, Sheridan's rates charged to AvMed are substantially above comparable benchmarks.

83.   On information and belief, the exclusive arrangements between Sheridan and hospitals in the relevant geographic markets also allow Sheridan to maintain its monopoly position through means other than competition on the merits. Anesthesiologists wanting to supply inpatient anesthesiology services in competition with Sheridan to consumers such as AvMed are prevented from doing so.

84.   On information and belief, Sheridan's exclusive dealing contracts and covenants not to compete have reduced or restricted the number of available anesthesiologists in the Tri-County area that hospitals or hospital systems could use to circumvent Sheridan. That restriction in the output of services has deprived managed care health plans such as AvMed of access to

inpatient anesthesiology services and has unreasonably narrowed the range of choices available to AvMed and other health plans in search of anesthesiologists in the Tri-County area.

85.   AvMed does not have the ability to offer a viable health plan to employers and residents within the Tri-County area without having within its network the hospitals and associated inpatient anesthesiology services where Sheridan and its affiliates are the only providers of inpatient anesthesiology services.

86.   Sheridan's conduct has caused, is causing, and will continue to cause substantial harm to competition and injuries to AvMed's business. The threat of future harm to competition and of future losses to AvMed resulting from Sheridan's unlawful actions cannot be adequately remedied absent injunctive relief.   Furthermore, the harm to competition caused by the acquisition of formerly independent anesthesiology practices and Sheridan's subsequent anticompetitive conduct cannot adequately be redressed absent injunctive relief, including but not limited to, the separation of Sheridan's practices into several distinct and independently operated businesses.

## X.  VIOLATIONS ALLEGED

### Count I – Unlawful Combination in Violation of Section 7 of the Clayton Act

87.   Plaintiff AvMed realleges each and every allegation of paragraphs 1-86 of this Complaint and incorporates them by reference.

88.   Since 2000, Sheridan has directly or indirectly acquired independent anesthesiology practices, in whole or in part, that have or had exclusive relationships with at least 15 facilities in the Tri-County area.  As a result of these acquisitions Sheridan has obtained or entered into exclusive relationships with these facilities and concentration in the Tri-County market for provision of inpatient anesthesiology services has increased by 2300 points, from a Herfindahl-Hirschman Index ("HHI") of approximately 500 to 2800.   Under the Horizontal Merger

- 32 -

Guidelines of the Department of Justice and Federal Trade Commission, where a post-merger HHI exceeds 1800, it is presumed that mergers producing an increase in the HHI of more than 100 points are "likely to create or enhance market power or facilitate its exercise." In addition, in part as a result of Sheridan's exclusive contracting arrangements and covenants not to compete, there are significant barriers to entry in the foregoing relevant markets and submarkets.

89.   The effect of Sheridan's direct or indirect acquisition of formerly independent anesthesiology practices, in whole or in part, and the formation of Sheridan in its current configuration has been substantially to lessen competition for the provision of inpatient anesthesiology services in the foregoing relevant geographic markets and submarkets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### Count II – Unlawful Combination and Agreements in Violation of Section 1 of the Sherman Act

90.   Plaintiff AvMed realleges each and every allegation of paragraphs 1-89 of this Complaint and incorporates them by reference.

91.   Sheridan has substantial market power in the following relevant markets and submarkets as indicated by its market shares of privately insured patients:  (a) the market for anesthesiology services at acute care hospitals in the Tri-County area (52%); (b)  the submarkets for anesthesiology services at acute care hospitals in each of Broward (58%), Palm Beach (65%) and Miami-Dade Counties (39%); (c) the submarkets for anesthesiology services at acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95 (43%-70%); and (d) the aftermarket for anesthesiology services at acute care hospitals where Sheridan is the exclusive provider (100%),

92. In addition, Sheridan's ability to raise prices and exclude competition in those markets, together with the barriers to entry that exist in those markets, demonstrate its market power irrespective of any market shares.

93. The acquisition of the formerly independent practices that now operate as Sheridan and the formation of Sheridan in its current configuration constitutes a combination that has had the effect of restricting competition in the provision of inpatient anesthesiology services in the relevant geographic markets. Such conduct, therefore, unreasonably restrains trade and constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94. Furthermore, Sheridan's exclusive agreements with hospitals and covenants not to compete with anesthesiologists unreasonably restrain trade because Sheridan has substantial market power in the markets and submarkets as set forth above, there is no legitimate business justification for the combination of these practices and, in any event, any legitimate business justification is outweighed by the anticompetitive effects.

## Count III – Monopolization

95. Plaintiff AvMed realleges each and every allegation of paragraphs 1-94 of this Complaint and incorporates them by reference.

96. Sheridan has monopoly power in the following relevant markets and submarkets as indicated by its market shares: (a) the aftermarket for anesthesiology services at acute care hospitals where Sheridan is the exclusive provider (100%); (b) the market for inpatient anesthesiology services at acute care hospitals in Tri-County area (52%); (c) the submarkets for inpatient anesthesiology services at acute care hospitals in each of Broward (58%) and Palm Beach (65%) Counties; and (d) certain of the submarkets for anesthesiology services at acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95, as detailed in Appendix A. These market shares understate Sheridan's

- 34 -

monopoly power because they do not include revenue-based market share calculations and because they do not reflect Sheridan's control of certain "must have" hospitals in the relevant geographic submarkets.

97.   In addition, Sheridan's ability to raise prices and exclude competition in those markets and submarkets, as well as Miami-Dade County, together with the barriers to entry that exist in those markets, demonstrate its monopoly power irrespective of any market shares.

98.   Since at least 2000 and continuing until at least the date of this Complaint, Sheridan has acquired, maintained or abused its monopoly power by engaging in the following predatory acts, among others, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2:

(a)   acquiring or otherwise obtaining control over formerly independent anesthesiology practices resulting in a lessening of competition in the relevant markets;

(b)   entering into exclusive arrangements with numerous hospitals in the Tri-County area that limit competition;

(c)   requiring employed anesthesiologists to enter into covenants not to compete which prevent the anesthesiologist from providing competition in the relevant markets even after they sever their employment relationships with Sheridan;

(d)   employing an "all-or-nothing" contracting strategy; and

(e)   unilaterally implementing its "acceptance by conduct" contracting strategy.

99.   The result of the above acts has been the reduction and elimination of significant price and quality competition among providers of anesthesiology services and higher prices being charged to patients, plans, health plans, and other third-party payors, including plaintiff AvMed.  Sheridan's conduct constitutes an unlawful monopolization of the market for inpatient anesthesiology services in the relevant geographic markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

- 35 -

## Count IV – Attempted Monopolization

100. Plaintiff AvMed realleges each and every allegation of paragraphs 1-99 of this Complaint and incorporates them by reference.

101. There is a dangerous probability that Sheridan will acquire monopoly power in the following relevant markets and submarkets where Sheridan has the following market shares: (a) the market for inpatient anesthesiology services at acute care hospitals in the Tri-County area (52%) ; (b) the submarkets for inpatient anesthesiology services at acute care hospitals in each of Broward (58%), Palm Beach (65%) and Miami-Dade Counties (39%); and (c) the submarkets for anesthesiology services at acute care hospitals within 30 minutes of any particular geographic location in the Tri-County area along Interstate 95 (43%-70%, as detailed in Appendix A).

102. In addition, Sheridan's ability to raise prices and exclude competition in those markets, together with the barriers to entry that exist in those markets, demonstrate that there is a dangerous probability of monopolization by Sheridan irrespective of its market shares.

103. Sheridan's anticompetitive conduct alleged herein has been undertaken with the specific intent to monopolize the market for inpatient anesthesiology services at acute care hospitals in the relevant geographic markets and creates a dangerous probability that Sheridan will, in fact, be able to monopolize this market.  Sheridan's conduct, therefore, constitutes an unlawful attempt to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## PRAYER FOR RELIEF

Having set forth its allegations against defendant herein, plaintiff respectfully requests that the Court award plaintiff the following relief:

(a)   a permanent injunction prohibiting Sheridan from enforcing any contract that has been obtained though the "acceptance by contract" approach and prohibiting Sheridan from engaging in such conduct in the future;

(b)  an order requiring Sheridan to divest as many of its acquired anesthesiology practices as are necessary to restore competition to the marketplace;

(c)  damages in an amount to be determined at trial, trebled in accordance with the law, the cost of suit, and reasonable attorneys' fees; and

(d)  such other relief as the Court deems just and proper.

Plaintiff demands trial by jury of all issues so triable.

Respectfully submitted,

Of Counsel:                                   HOLLAND & KNIGHT LLP

Steven M. Edwards
HOGAN & HARTSON LLP
875 Third Avenue                              Frederick D. Page
New York, NY 10022                            Florida Bar No. 968587
(212) 918-3506                                50 North Laura Street, Suite 3900
(212) 918-3100 (facsimile)                    Jacksonville, Florida 32202
                                              (904) 353-2000
Robert F. Leibenluft                          (904) 358-1872 (facsimile)
Benjamin F. Holt                              fpage@hklaw.com
Justin W. Bernick
HOGAN & HARTSON LLP                           Attorneys for AvMed, Inc.
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
(202) 637-5910 (facsimile)

# APPENDIX A

**Sheridan shares of surgical inpatient admissions among hospitals within 30-minute drive time radii of zip codes along I-95, privately insured non-Medicare patients**

| I-95 Zip | City | County | Totals within 30-minute radius of I-95 zip | | Sheridan share (%) |
|---|---|---|---|---|---|
| | | | *Hospitals* | *Admissions* | *Admissions* |
| 33407 | West Palm Beach | Palm Beach | 10 | 10,072 | 64.7 |
| 33409 | West Palm Beach | Palm Beach | 11 | 11,894 | 70.1 |
| 33401 | West Palm Beach | Palm Beach | 11 | 11,894 | 70.1 |
| 33405 | West Palm Beach | Palm Beach | 11 | 11,894 | 70.1 |
| 33406 | West Palm Beach | Palm Beach | 11 | 11,894 | 70.1 |
| 33460 | Lake Worth | Palm Beach | 13 | 13,496 | 61.8 |
| 33461 | Lake Worth | Palm Beach | 12 | 12,282 | 58.0 |
| 33462 | Lake Worth | Palm Beach | 12 | 12,282 | 58.0 |
| 33426 | Boynton Beach | Palm Beach | 14 | 13,653 | 60.0 |
| 33445 | Delray Beach | Palm Beach | 20 | 19,939 | 47.7 |
| 33435 | Delray Beach | Palm Beach | 16 | 16,594 | 49.4 |
| 33444 | Delray Beach | Palm Beach | 18 | 18,092 | 50.9 |
| 33487 | Boca Raton | Palm Beach | 18 | 17,726 | 46.7 |
| 33431 | Boca Raton | Palm Beach | 12 | 12,332 | 43.0 |
| 33486 | Boca Raton | Palm Beach | 18 | 19,122 | 55.1 |
| 33442 | Deerfield Beach | Broward | 19 | 21,307 | 49.9 |
| 33441 | Deerfield Beach | Broward | 18 | 19,785 | 56.6 |
| 33064 | Pompano Beach | Broward | 20 | 20,438 | 58.0 |
| 33069 | Pompano Beach | Broward | 22 | 24,036 | 54.5 |
| 33060 | Pompano Beach | Broward | 22 | 22,806 | 52.0 |
| 33334 | Fort Lauderdale | Broward | 22 | 24,036 | 54.5 |
| 33309 | Fort Lauderdale | Broward | 23 | 25,253 | 56.6 |
| 33311 | Fort Lauderdale | Broward | 21 | 23,046 | 56.8 |
| 33312 | Fort Lauderdale | Broward | 26 | 28,264 | 50.6 |
| 33315 | Fort Lauderdale | Broward | 25 | 27,579 | 51.9 |
| 33021 | Hollywood | Broward | 25 | 26,274 | 53.4 |
| 33004 | Dania | Broward | 27 | 29,259 | 54.1 |
| 33020 | Hollywood | Broward | 28 | 28,457 | 55.7 |
| 33009 | Hallandale | Broward | 32 | 32,296 | 49.0 |
| 33179 | Miami | Dade | 31 | 30,474 | 46.0 |
| 33169 | Miami | Dade | 32 | 34,704 | 50.2 |
| 33168 | Miami | Dade | 35 | 37,286 | 52.8 |
| 33150 | Miami | Dade | 31 | 34,914 | 52.5 |
| 33127 | Miami | Dade | 31 | 34,914 | 52.5 |
| 33136 | Miami | Dade | 26 | 28,070 | 56.4 |

Notes:

- Shares derived from AHCA Discharge Data for 2007Q1–2007Q3 and are based on admissions of privately insured patients in surgical Diagnosis Related Groups (DRGs) as defined in the CMS FY2007 DRG classification.
- Each 30-minute drive time radius around an I-95 zip code includes inpatient acute care hospitals whose address is within a 30-minute drive of the centroid of the I-95 zip code. Drive times are calculated using Microsoft MapPoint.
- Sheridan shares of admissions in each 30-minute radius are calculated by dividing admissions to Sheridan hospitals within the 30-minute radius by total admissions to all hospitals within the 30-minute radius.
- Sheridan hospitals: Aventura Hosp. & Med. Ctr.; Baptist Hosp. of Miami; Boca Raton Cmty. Hosp.; Columbia Hosp.; Good Samaritan Med. Ctr.; Jackson North Med. Ctr.; JFK Med. Ctr.; Jupiter Med. Ctr.; Kendall Reg. Med. Ctr.; Mem. Hosp. Miramar; Mem. Hosp. Pembroke; Mem. Hosp. West; Mem. Reg. Hosp. South; Mem. Reg. Hosp.; Mercy Hosp.; Northwest Med. Ctr.; Palms West Hosp.; Plantation Gen. Hosp.; University Hosp. & Med. Ctr.; Wellington Reg. Med. Ctr.; Westside Reg. Med. Ctr.

JS 44 (Rev. 2/08)

**CIVIL COVER SHEET** 09 - 23851

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

AvMed, Inc.

**DEFENDANTS**

Sheridan Healthcorp, Inc.

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Frederick D. Page, Holland & Knight LLP, 50 North Laura Street, Suite 3900, Jacksonville, Florida 32202   (904) 353-2000

CIV - HUCK

FILED by RAL D.C.

DEC 29 2009

Attorneys (If Known)

Unknown

MAGISTRATE JUDGE
O'SULLIVAN

STEVEN M. LARIMORE

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   ☐ HIGHLANDS

(RAL) 12/30/09: 4 as per Peggy York, Asst. to Frederick Page, Esq. S.D. of FLA.
MIAMI

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

09 CV 23851   Huck / O'Sullivan

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**   (See instructions second page):

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☐ YES ☑ NO

JUDGE                                 DOCKET NUMBER

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Violations of 15 U.S.C. §§ 1, 2, 15, 18 and 26, arising out of the monopolization or attempted monopolization of the specified anesthesiology markets, and/or other anticompetitive misconduct.
LENGTH OF TRIAL via  20  days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $**   CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD                   DATE

FBN 0968587      12/28/09

FOR OFFICE USE ONLY

AMOUNT               RECEIPT #                 IFP